### In the Matter of William B. EWERS. Disbarment No. 106.

United States Court of Appeals District of Columbia Circuit.

May 4, 1966.

Messrs. James C. Wilkes and Albert L. Ledgard, Jr., Washington, D. C., for respondent, William B. Ewers.

Before BAZELON, Chief Judge, and FAHY,* DANAHER, BURGER, WRIGHT, MCGOWAN, TAMM, LEVENTHAL, and ROBINSON,** Circuit Judges, in Chambers.

### ORDER

PER CURIAM.

It appearing that on March 4, 1966, the United States District Court for the District of Columbia entered an order suspending William B. Ewers as a member of the bar of that court for an indefinite period, provided however that the said

* Senior Circuit Judge Fahy participated in this matter prior to his retirement on April 13, 1967.

** Circuit Judge Robinson did not participate in the consideration or decision of this matter.

William B. Ewers, after the expiration of ninety (90) days, might petition the court for a termination of such suspension; and

It further appearing that this court on March 21, 1966, suspended William B. Ewers from the practice of law before this court and allowed him forty (40) days therefrom within which to show cause why he should not stand suspended or be disbarred; and

It further appearing that on May 16, 1966, this court entered an order suspending William B. Ewers as a member of the bar of this court for an indefinite period, without prejudice to a motion for reinstatement after action by the District Court if application for reinstatement was made therein; and

It further appearing that on June 13, 1966, the United States District Court for the District of Columbia being satisfied that Mr. Ewers had in all respects complied with its orders ordered that Mr. Ewers' suspension be terminated, now on consideration of Mr. Ewers' motion for reinstatement as a member of the bar of this court, it is

Ordered by the court that the motion for reinstatement to the bar of this court is denied by an equally divided court.

BURGER, Circuit Judge, with whom DANAHER and TAMM, Circuit Judges, join, concurring in denial of application:

On May 16, 1966, following respondent's suspension as a member of the bar of the District Court because of professional misconduct, we ordered similar suspension from the bar of this Court. The District Court thereafter reinstated respondent to its roll of attorneys. He immediately moved for reinstatement to our Court, based on the action of the District Court.

Today this Court by an equal division of votes denies the motion for reinstatement. I voted to deny the motion for reinstatement because to do otherwise would seem to be in plain conflict with our own recent holding in *Quimby* [1] that, absent unusual extenuating circumstances, a lawyer's embezzlement of guardianship or other fiduciary funds entrusted to him should lead to disbarment. While our action today will preclude respondent from appearing in any appeal in our Court, he stands only suspended, not disbarred, and he is still free to hold himself out as a lawyer licensed by the District Court. Since four members of this Court would reinstate respondent as a member in good standing authorized to hold himself out as an officer of this Court, I feel constrained to file a brief recital of the salient facts and the reasons for my position.

In 1955 respondent was appointed by the District Court as Conservator for the estate of a mentally incompetent individual. See In the Matter of Earl E. Caul, CA 5001–55. In the eighth accounting period for the conservatorship the respondent withdrew without authorization and appropriated for his own use a total of $2374.50 from the trust account, broken down as follows: December 10, 1962, $525; December 11, 1962, $780; December 14, 1962, $200; April 2, 1963, $375; August 6, 1963, $200; and November 21, 1963, $294.50. On December 6, 1963 and December 9, 1963, immediately prior to the termination of the eighth accounting period, respondent repaid what he had appropriated.

On January 9, 1964, respondent filed the formal accounting report for the eighth accounting period with the District Court. The report did not disclose the unauthorized withdrawals or their repayment. Moreover, by the time respondent had filed this eighth report he had already appropriated, again for his own use, an additional $2475 from the trust account during the next, or ninth, accounting period. The total unauthorized withdrawals in this accounting period amounted to $2576.

On May 11, 1964, the Deputy Auditor of the District Court wrote a letter to respondent requesting information con-

---

1. In the Matter of Quimby, 123 U.S.App.D.C. 273, 359 F.2d 257 (1966).

cerning the unauthorized withdrawals in the eighth accounting period, which the Auditor had apparently discovered in the course of his annual audit of the conservatorship account. On June 10, 1964, after due notice, the Deputy Auditor held a hearing on the unauthorized withdrawals in the eighth accounting period. The respondent admitted he had withdrawn funds from the account without authorization. The transcript of the hearing also reveals the following:

Deputy Auditor: You know now it was an error and you have replaced the funds?

A: That is correct.

\*     \*     \*     \*     \*     \*

Deputy Auditor: Was there any particular necessity on your part for making these withdrawals?

A: No, your Honor.

At that precise moment, unknown to the Auditor and undisclosed by respondent, he had appropriated from the trust account during the ninth accounting period the sum of $2576. It is not true, therefore, as respondent has suggested, that he restored all his defalcations before they were discovered. The hearing at which the respondent was confronted with defalcations concerned only the *eighth* accounting period. Yet the respondent failed to tell the auditor that he was, at that very moment, "indebted" to the account in the next accounting period for the additional amount last mentioned. That information would, of course, not come to light until the next account was filed. This was a plain case of "kiting" accounts to cover his fraud, reflecting a studied and purposeful breach of trust against the mentally incompetent ward, compounded by a purposeful fraud on the Auditor and District Court as well.

In his report filed July 31, 1964, the Deputy Auditor fully documented the facts just related as to the unauthorized withdrawals in the eighth accounting period. As a result of his investigation, he recommended that the respondent be removed as Conservator and be directed to file a final accounting.

Respondent filed a petition to resign as Conservator on August 6, 1964, which was granted the same day, and a successor was appointed. On August 18, 1964, respondent filed his final account which contained no mention of the unauthorized withdrawals occurring in the ninth period. On August 24, 1964, *after* his successor had qualified and assumed management of the conservatorship, and after the defalcation could no longer be concealed, respondent repaid the amount withdrawn from the account during this last accounting period together with bank charges. On September 8, 1964, respondent filed an amended final account which also did not show the unauthorized withdrawals. The defalcations in this period were discovered subsequently by the Auditor in the course of the audit of this final account. Since, however, the funds had been replaced and the respondent removed as Conservator, the Auditor made no recommendations concerning respondent.

I think it is clear from these facts that respondent's conduct with respect to trust funds in his control cannot be distinguished in any meaningful way from that which we dealt with on another occasion recently, In the Matter of *Quimby, supra* note 1; indeed in many respects they appear to be more serious. I do not advocate that every "borrowing" of trust assets by a fiduciary be followed automatically by disbarment; I made plain my view that a default might be explained even if it cannot be justified. In *Quimby* we held:

When a member of the bar is found to have betrayed his high trust by embezzling funds entrusted to him, disbarment should ordinarily follow as a matter of course. Such misconduct demonstrates absence of the basic qualities for membership in an honorable profession. Only the most stringent of extenuating circumstances would justify a lesser disciplinary action, such as suspension, \*   \*   \*.

*Supra* note 1 at 274, 359 F.2d at 258. I do not view disbarment primarily as a punitive measure; rather I view the extreme measure of disbarment as removing the lawyer on the one hand from a preferred and licensed posture as one whom the court has certified and held out as worthy of trust and, on the other, as relieving him so far as possible from the temptations and hazards of handling the funds of others.

In our opinion in *Quimby* we acknowledged the dangers of too easy an attitude toward violations of ethical and professional standards.

> The appearance of a tolerant attitude * * * would give the public grave cause for concern and undermine public confidence in the integrity of the profession and of the legal system whose functioning depends upon lawyers.

*Ibid.*

Since there is nothing in this record showing extenuating circumstances which would distinguish this case from *Quimby,* denial of the motion for present reinstatement would seem at the very least singularly appropriate in the circumstances.